**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TONY AND JENNIE PUNCH, as** | ) | |
| **Parents and Natural Guardians of** | ) | |
| **Lincoln Punch, a minor, and in** | ) | |
| **their own right,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **C.A. No. 12-154 Erie** |
| | ) | |
| **v** | ) | **District Judge Bissoon** |
| | ) | **Magistrate Judge Baxter** |
| **DOLLAR TREE STORES, INC.,** | ) | |
| | ) | |
| **Defendant/Third Party** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v** | ) | |
| | ) | |
| **DOLLAR CONNECTION, LTD.,** | ) | |
| | ) | |
| **Third Party Defendant/** | ) | |
| **Fourth Party Plaintiff,** | ) | |
| | ) | |
| **v** | ) | |
| | ) | |
| **GREENBRIER INTERNATIONAL,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Fourth Party Defendant,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

It is respectfully recommend that Defendant Dollar Connection's Motion for Summary

Judgment Based Upon Statute of Limitations [ECF No. 166] be granted; Defendant Dollar

Connection's Motion for Summary Judgment Based Upon Spoliation of the Product at Issue

1

[ECF No. 167] be denied; Defendant Dollar Connection's Motion for Summary Judgment as to Plaintiffs' Design Defect Claims [ECF No. 171] be denied; Defendant Dollar Connection's Motion for Summary Judgment as to Plaintiffs' Failure to Warn Claims [ECF No. 174] be granted; and Defendants Dollar Tree and Greenbrier's Motion for Summary Judgment [ECF No. 177] be granted in part and denied in part.

## II.     REPORT

### A.     Relevant Factual and Procedural History

On April 11, 2011, Plaintiffs Tony and Jennie Punch were at home with three of their children: Remington, age 5; Jenna, age 3; and Lincoln, only six days old. (ECF No. 179, ¶ 1). Tony was working outside in the yard with Jenna and Remington while Jennie spent the morning watching a movie indoors with Lincoln. (Id; ECF No. 172-7 at 103). At some point between 11:00 a.m. and noon, Jennie left Lincoln alone on a mattress in her living room for approximately five minutes to use the bathroom. (ECF No. 179, ¶ 1). When Jennie returned from the bathroom, her three-year-old, Jenna, was sitting on the mattress with Lincoln. (Id.).

Tony Punch testified that Jenna went inside "around lunchtime" to see her mother or get a drink. (ECF No. 172-8 at 45). When Tony and Remington returned to the house approximately fifteen minutes later, Tony found Jenna on the bed holding Lincoln. (ECF No. 179 ¶ 2). He also noticed a pair of lighted tweezers on the floor between the front door and the bed. (Id.). He observed that the battery compartment attached to the tweezers was in two pieces, as if it had been opened, and that a single button-battery was lying nearby. (Id; ECF No. 172-8 at 56-57). After picking up the tweezers and inserting the battery into the compartment, Tony deduced from

the size of the gap in the battery compartment that at least two other button-batteries were missing. (ECF No. 179 ¶ 2). Tony testified that this was the first time he had seen the inside of the tweezers. (ECF No. 172-8 at 58). Tony, Jenna and Remington spent the following hour or two unsuccessfully searching for the missing batteries. (ECF No. 179 ¶ 3). Tony felt it was important to find the batteries because they were small and could potentially be swallowed by the children. (ECF No. 172-8 at 58).

At approximately 1:00 p.m., Jennie unsuccessfully attempted to feed Lincoln. (ECF No. 179, ¶ 4). Around 3:00 p.m., she heard Lincoln make a strange noise while he was sleeping, as if he was "sucking in air." (ECF No. 172-7 at 111). A short time later, Jennie noticed that Lincoln appeared to be crying without making any noise. (Id. at 112-13). When this persisted, she decided to take Lincoln to the Emergency Room at Warren General Hospital. (ECF No. 179, ¶¶ 4-5). An x-ray revealed that Lincoln had ingested two button-batteries.[1] (Id., ¶ 6). According to Jennie, when she saw the x-ray, "knowing what happened with the flashlight [tweezers] earlier, it just all clicked together." (Id.). Although Tony and Jennie inferred that one of their children must have fed the batteries to Lincoln, neither of them ever asked Jenna or Remington any details concerning the incident.[2] (ECF No. 172-7 at 125; ECF No. 172-8 at 207).

The lighted tweezers at issue were purchased by Jennie from a Dollar Tree store in Warren, Pennsylvania, at some point during the spring or early summer of 2010. (ECF No. 179,

---

[1] Jennie contacted the hospital much later on in an attempt to obtain the batteries but was told that they had already been disposed of. ECF No. 172-7 at 213.

[2] Tony testified that Jenna admitted years later to having fed the batteries to Lincoln. ECF No. 172-8 at 18.

¶ 21; ECF No. 178-1 at 38). The tweezers consist of a pair of metal tweezers encased in a plastic housing containing an LED light, batteries, and a small magnifying glass. (ECF No. 172-5). Jennie paid cash for the tweezers and did not save the receipt. (ECF No. 178-1 at 37-38). Jennie had previously purchased an identical pair of tweezers from Dollar Tree but had discarded them because the light didn't work. (Id. at 35-38).

The light on the tweezers was powered by three small AG13 alkaline batteries, each of which is approximately 11.6 mm in diameter. (ECF No. 179 ¶ 20). Jennie was aware when she purchased the tweezers that they were sharp, contained batteries, and needed to be kept out of the reach of her children. (Id., ¶ 21). Tony Punch acknowledged that the tweezers were for parental use only and were potentially dangerous, but stated that he was not aware that they contained button-batteries until the date of the incident. (ECF No. 172-8 at 109-110). In order to keep the tweezers away from their children, both Tony and Jennie testified that the tweezers were stored on a shelf above the dishwasher in a hall closet. (ECF No. 179, ¶ 24).

From 2008 through the fall of 2010, all lighted tweezers sold by Dollar Tree were distributed by Dollar Connection, a Chinese distributor. (ECF No. 179, ¶ 25). The tweezers were ordinarily sold in individual plastic blister packages with a cardboard insert and a separate information sheet. (ECF No. 172-5; ECF No. 167-16 at 117-19). The cardboard package indicates that the product has an LED light, a build-in magnifier, and "Requires AG13 Button Cell Batteries (included)." (ECF No. 172-5). The information sheet contains a warning to "Keep out of reach of children . . ." (ECF No. 168, ¶ 28). However, Jennie Punch testified that the tweezers that she purchased from the Warren Dollar Tree were not accompanied by any

packaging or instructions on either occasion. (ECF No. 172-7 at 204-05; ECF No. 193-2 at 30-31).

Within a couple of days of discovering that Lincoln had ingested two button-batteries, Tony headed home and threw away the subject tweezers and the remaining button-battery. (ECF No. 179, ¶ 7). He also threw away several other household items that contained button-batteries including three thermometers, a bath towel, lighted children's shoes, a lighted children's shirt, and a couple of toys. (Id.). Although the key fob for each of the Punch's vehicles also contained button batteries, Tony testified that they kept the fobs but stored them "way up" out of reach. (ECF No. 178-2 at 99). Tony stated that he was not contemplating a lawsuit at the time that he threw those items away and that he simply wanted to remove them from the house for his children's safety. (ECF No. 178-2 at 94-95).

At some point thereafter, Tony's cousins, Walter and Jessica Lindsey, visited the same Dollar Tree location and photographed two pairs of tweezers that they found on shelves in the store. (ECF No. 167-8; ECF No. 167-9 at 22-24). The Lindseys purchased both sets of tweezers, neither of which appear to have been accompanied by packaging or information. (ECF No. 179, ¶ 9). Tony's mother, Shawnie Siliano, also purchased a set of tweezers at the same store. (Id., ¶ 11). Siliano testified that those tweezers were packaged in a blank cardboard package that contained no text or information. (Id.). Each of these tweezers was allegedly presented to the Punch's prior counsel, along with receipts. (Id., ¶¶ 10, 12). However, neither the tweezers nor the receipts have been produced in this litigation. (Id.).

Lincoln's ingestion of the two button-batteries produced devastating life-long injuries.

As the result of Lincoln's injuries, Tony and Jennie initiated the instant lawsuit on July 6, 2012, asserting claims in their own right and on behalf of their minor son. (ECF No. 1). In response to Dollar Tree's motion to dismiss, the Punches filed an Amended Complaint on October 1, 2012. (ECF No. 12).

On January 14, 2014, Dollar Tree filed a Third Party Complaint against Dollar Connection. (ECF No. 37). On February 3, 2015, the Punches filed a Third Party Complaint against Dollar Connection, alleging the same claims that they had previously alleged against Dollar Tree. (ECF No. 65).

Following the close of discovery, Dollar Connection filed four separate Motions for Summary Judgment:

1)     Motion for Summary Judgment Based Upon Statute of Limitations (ECF No. 166)

2)     Motion for Summary Judgment Based Upon Spoliation of the Product at Issue (ECF No. 167)

3)     Motion for Summary Judgment as to Plaintiffs' Design Defect Claims (ECF No. 171)

4)     Motion for Summary Judgment as to Plaintiffs' Failure to Warn Claims (ECF No. 174)

With the exception of the Motion for Summary Judgment based upon the Statute of Limitations, to which the Plaintiffs did not respond, each of these motions is fully briefed, and all are now ripe for review. (See ECF Nos. 194, 197, 200, 211, 212, 214).

Dollar Tree[3] filed a separate Motion for Summary Judgment on June 30, 2016. (ECF No. 177). That motion is also fully briefed and ripe for disposition. (See ECF Nos. 203, 215).

## B.    Standard of Review

Federal Rule of Civil Procedure 56(c)(2)  provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed.R.Civ.P. 56(c). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d

---

3

Dollar Tree's summary judgment motion also seeks dismissal on behalf of Fourth Party Defendant Greenbrier International, Inc. ("Greenbrier"). For purposes of this Report and Recommendation, Greenbrier and Dollar Tree

458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return

---

will be collectively referred to as "Dollar Tree."

a verdict for the non-moving party. Id. at 247-249.

"Where the party opposing a motion for summary judgment bears the ultimate burden of proof, the moving party may discharge its initial burden of showing that there is no genuine issue of material fact 'by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" Player v. Motiva Enterprises, LLC, 240 Fed.Appx 513, 522 n4 (3d Cir. 2007) quoting UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004). If the moving party has satisfied its initial burden, the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact. Childers v. Joseph, 842 F.2d 689, 694-95 (3d Cir. 1988).

**C.**     **Discussion**

In their Amended Complaint, Plaintiffs claim that the subject tweezers "were dangerous and defective in that they contained button batteries, they failed to restrict access to the button batteries, failed to contain appropriate warnings or instructions, and failed to adequately protect and hold the button batteries." (ECF No. 12, ¶ 24). Plaintiffs also claim that Dollar Tree was "negligent and careless in selling this product without any warnings or instructions and without alerting customers to the potential dangers of button batteries." (Id. at ¶ 25). Plaintiffs' Third Party Complaint asserts the same claims against Dollar Connection based on their role in importing the tweezers for sale by Dollar Tree. (ECF No. 90, ¶¶ 39-40).

Although Dollar Tree and Dollar Connection have each filed separate motions for summary judgment, there is substantial overlap between the motions. In addition to seeking judgment on the merits of Plaintiffs' design defect and failure to warn claims, Defendants request

judgment as a sanction for spoliation based on Plaintiffs' failure to retain and preserve the subject tweezers. (ECF No. 170; ECF No. 178 at 18). Each of these matters will be discussed in turn.

### 1. Spoliation

As an initial matter, Defendants seek dismissal of all claims based on the Plaintiffs failure to preserve and produce the tweezers at the heart of this litigation. "'Spoliation of evidence' is the failure to preserve or the significant alteration of evidence for pending and future litigation." Parr v. Ford Motor Co., 109 A.2d 682, 701-02 (Pa. Super. 2014) (quoting Pyeritz v. Commonwealth, 32 A.2d 687, 692 (Pa. 2011)). Spoliation occurs where: "the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." Bull v. United Parcel Serv., Inc., 665 F.3d 68, 73 (3d Cir. 2012). The party seeking a spoliation sanction bears the burden of proving each of these factors. Universal Underwriters Inc. Co. v. Dedicated Logistics, Inc., 2014 WL 7335668, at *4 (W.D. Pa. Dec. 19, 2014).

The parties do not dispute that the subject tweezers were relevant evidence that was entirely within the Plaintiff's control. Consequently, the Court's inquiry shifts to the third and fourth factors.

The third factor, actual suppression, addresses whether the plaintiff failed to preserve or produce the evidence in question. Defendants contend that this factor is satisfied by Tony Punch's candid admission that he disposed of the tweezers, the remaining button battery, and

several other items in the house containing button batteries. (ECF No. 179, ¶ 7). However, as noted by Plaintiffs, "the third factor requires bad faith to show actual suppression." <u>Micjan v. Wal-Mart Stores, Inc.</u>, 2016 WL 738052, at *10 (W.D. Pa. Feb. 25, 2016); <u>Bull</u>, 665 F.3d at 79 ("A finding of bad faith is pivotal to a spoliation determination"). Tony testified that his sole rationale for disposing of those items was that he didn't want to risk having them around his children in the wake of Lincoln's injury. (ECF No. 172-8 at 94-96). He removed the items within "only . . . a couple days" of Lincoln's admission to the hospital, before the extent of Lincoln's injuries were known and before the Punches took any steps towards engaging legal counsel. (ECF No. 178-2 at 94-96; ECF No. 172-7 at 224). At that time, Tony was more focused on safety concerns and his children's health than potential litigation. (ECF No. 178-2 at 94-97). Under these facts, the disposal of the tweezers, while regrettable in hindsight, simply does not rise to the level of "a deliberate attempt to impede a potential defense." <u>Micjan</u>, 2016 WL 738052, at *10.

Defendants respond that it is "incorrect and illogical" to apply a bad faith analysis to the facts at hand:

> While bad faith may be considered by a court in determining whether a party has intentionally withheld evidence that is still in that party's physical possession, and bad faith may also be relevant to a court in determining what sanction to impose for the spoliation of evidence, a showing of bad faith is simply not required to establish that spoliation occurred where there has been **a failure to preserve evidence**.

(ECF No. 211 at 3 n. 2) (emphasis in original). However, Defendants cite no authority for this position, and our review of recent case law compels the opposite conclusion. In <u>Micjan</u>, for example, the plaintiffs brought suit on behalf of their infant son after he died of asphyxia while

sleeping in his crib. Micjan, 2016 WL 738052, at *1. They sued Wal-Mart, alleging that the

cause of the incident was a "defective and dangerous crib bumper." Id. In response to discovery

requests, they indicated that several other items had been in the crib with their son, but admitted

that those items had not been retained. Id. Many of those items had apparently been lost during a

subsequent move, another was destroyed by their dog, and the crib and crib mattress had been

donated to Goodwill. Id. at *2. The court rejected defendants' argument that the loss of those

items, including those that were intentionally disposed of, amounted to spoliation:

> Defendants have not met the standards necessary to demonstrate that
> spoliation occurred. The items were in Plaintiffs' control and it is
> plausible that they would be relevant to Defendants' defense in this case,
> namely, that Dylan asphyxiated on an object other than the crib bumper
> pad. But, as noted above, the third factor requires bad faith to show
> actual suppression and the evidence in this case is that most of the items
> were lost when Plaintiffs moved from Virginia to Pennsylvania, their dog
> destroyed one item and they gave the crib and crib mattress to Goodwill.
> There is no evidence that their actions were a deliberate attempt to
> impede a potential defense.

Id. at *10; see also Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995)

("No unfavorable inference arises when the circumstances indicate that the document or article in

question has been lost or accidentally destroyed, or where the failure to produce it is otherwise

properly accounted for"); 29 Am.Jur.2d §177 (noting that spoliation arises only where the

destruction of evidence "was intentional, and indicates fraud and a desire to suppress the truth"

rather than "where the destruction was a matter of routine with no fraudulent intent").

Defendants have also failed to satisfy the fourth spoliation factor. Tony Punch provided

uncontradicted testimony that he was not considering the possibility of a lawsuit at the time that

12

he disposed of the relevant items. (ECF No. 172-8 at 96). The record reflects that he did not contact an attorney until June of 2011, approximately two months later. (ECF No. 179, ¶ 8). Given their status as lay persons who were still several weeks removed from contemplating a lawsuit, we cannot conclude that the "duty to preserve the evidence was reasonably foreseeable" Tony and Jennie Punch at the time that the items were removed. See Micjan, 2016 WL 738052, at *10 ("Defendants have not explained how the 'duty to preserve the evidence was reasonably foreseeable to' Plaintiffs, lay persons who would have had no reason to anticipate that the blanket, mattress and other items could be part of some future defense in a lawsuit they had not filed."); Bull, 665 F.3d at 77-78 (noting that the "question of reasonable foreseeability is a flexible fact-specific standard" that allows the district court considerable discretion in evaluating "the myriad factual situations inherent in the spoliation inquiry.").

Even if Defendants could establish that spoliation occurred, the "drastic sanction" of dismissal would still not be warranted here. Schmid, 13 F.3d at 79. The key considerations in determining whether such a sanction is appropriate are: "1) the degree of fault of the party who altered or destroyed the evidence; 2) the degree of prejudice suffered by the opposing party; and 3) the availability of a lesser sanction that will protect the opposing party's rights and deter future similar conduct." Schmid v. Milwaukee Electric Tool Co., 13 F.3d 76, 79 (3d Cir. 1994). As discussed above, while the loss of the tweezers can be directly attributed to the Plaintiffs, their conduct did not amount to bad faith or intentional misconduct. Moreover, it is well-established that the degree of prejudice to a defendant is significantly reduced where the plaintiff alleges that all products in a product line suffered from a common defect. Schmid, 13 F.3d at 80. As

explained by the Third Circuit:

> Turning . . . to the extent of the prejudice to the defendant, it is important to note at the outset that this is a *design* defect case. This is not a case in which the plaintiff contends that the particular saw causing his injuries was defectively manufactured; there is no claim that the saw had a defect not shared by all saws of the same model. Rather, Schmid's claim is that the design of saws of this model permitted particles to infiltrate the guard mechanism, thereby impairing its effectiveness and that those saws could have been designed with a seal that would have prevented the infiltration. Because this was Schmid's theory, Electric Tool's need for immediate access to the particular saw involved in the accident was greatly diminished. The ability to determine whether the design of its saw permits sufficient infiltration to impair the guard's effectiveness and whether a safer design is feasible are matters that can be determined as well or better by inspecting and testing multiple saws of the same design than by inspecting the particular saw involved in the accident.

Id. at 79-80 (emphasis in original); see also Micjan, 2016 WL 738052, at *10 (observing that prejudice is "less severe in a design defect case" because "the defendant can test and examine multiple products of the same design"); Quaile v. Carol Cable Co., Inc., 1993 WL 53563 (E.D. Pa. Feb. 26, 1993) (finding no prejudice where plaintiff disposed of the allegedly defective lamp at issue because plaintiff's theory of the case postulated that all such lamps were defectively designed and, therefore, defendant could examine any of their lamps to evaluate whether this was the case).

This case falls squarely within the common design defect scenario addressed in Schmid. Plaintiffs are not alleging that the particular pair of tweezers that caused Lincoln's injury was defectively manufactured. Rather, they contend that *every tweezer* manufactured with that same design was defective. The safety of this design, and the determination as to whether an alternative design would be safer, are "matters that can be determined as well or better by

inspecting and testing multiple [items] of the same design than by inspecting the particular [tweezers] involved in the accident." <u>Schmid</u>, 13 F.3d at 79-80.

In sum, because Defendants have failed to demonstrate each of the elements of spoliation, and because the pertinent <u>Schmid</u> factors do not support the extreme sanction of dismissal, it is recommended that Defendants' motions for summary judgment be denied in this regard.

### 2.    Design Defect – Strict Liability

Defendants next contend that Plaintiffs have failed to adduce any evidence to support their defective design claims. To prevail on a strict liability claim based on a defective design, a plaintiff must show: (1) the product was defective; (2) the defect proximately caused the plaintiff's injury; and (3) the defect existed at the time the product left the defendant's control. <u>Wright v. Ryobi Techs., Inc.</u>, 2016 WL 1241860, at *5 (E.D. Pa. Mar. 30, 2016) (citing <u>Pavlik v. Lane Ltd./Tobacco Exp. Int'l</u>, 135 F.3d 876, 881 (3d Cir. 1998)). A plaintiff may prove a product is "defective" by showing that either: (1) "the danger is unknowable and unacceptable to the average or ordinary consumer" (the "consumer expectations standard"); or (2) "a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs or taking precautions" (the "risk-utility standard"). <u>Tincher v. Omega Flex, Inc.</u>, 104 A.3d 328, 385-91 (Pa. 2014). A plaintiff may proceed under either theory, but needs only to prevail on one to demonstrate the existence of a defect. <u>Id</u>. at 391. In the instant case, this Court has previously determined that Plaintiffs must proceed pursuant to the risk-utility standard. <u>See</u> <u>Punch v. Dollar Tree Stores, Inc</u>., 2015 WL 7769223, at *5 (W.D. Pa. Nov. 5, 2015) (holding that Plaintiffs had failed to state a cognizable strict liability claim based on the

consumer expectations standard but could proceed under the risk-utility standard).

The risk-utility standard "offers courts an opportunity to analyze *post hoc* whether a manufacturer's conduct in manufacturing or designing a product was reasonable, which obviously reflects the negligence roots of strict liability." Tincher, 104 A.3d at 398 (citations omitted). Under this standard, a product is deemed to be in a defective condition if "a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." Id. The standard invokes "the common sense idea that products are unacceptably dangerous if they contain dangers that might cost-effectively (and practicably) be removed." Id. at 390 (internal quotation and citation omitted). In performing this cost-benefit analysis, the Pennsylvania Supreme Court has suggested that courts may consider the following non-exhaustive list of seven factors:

(1) The usefulness and desirability of the product – its utility to the user and to the public as a whole.

(2) The safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the

price of the product or carrying liability insurance.[4]

Id. (quoting John W. Wade, ON THE NATURE OF STRICT TORT LIABILITY FOR PRODUCTS, 44 Miss. L.J. 825, 831–32 (1973)). Our analysis will be guided by these factors, keeping in mind that "while these considerations may provide a holistic perspective on a manufacturer's choice to bring a product to market, they may not be immediately responsive in the (typical) case implicating allegations relating to a particular design feature." Id. (citation omitted).[5]

### a)    Utility of the Product

The first factor considers the usefulness of the product. In this case, the utility of the product is obvious. Over 1.4 million of the lighted tweezers were distributed in the United States by Dollar Connection between January 2008 and October 2009, reflecting a consumer interest and demand for a pair of tweezers with a built-in light. (ECF No. 173, ¶ 1). Jennie Punch testified that the tweezers worked well to remove splinters and that the light added unique value because, "[i]f a splinter or whatever is small enough that you can't see it, you need a flashlight, and it's easier to hold one object rather than two." (ECF No. 193-2 at 226-27). Both Jennie and Tony testified that they used the lighted tweezers when they needed to pull a splinter from their children's feet. (Id. at 199-200; ECF No. 172-8 at 145). Indeed, when the light attached to the

---

4

The parties largely minimize the utility of the seventh factor under the facts of this case (or ignore it entirely). As such, the Court's analysis will focus on the remaining six factors.

5

In Barker v. Lull Engineering Co., 573 P.2d 443 (Cal. 1978), a case cited favorably in Tincher, the California Supreme Court articulated the following list of similar factors: (1) the gravity of the danger posed by the challenged design; (2) the probability that such danger would occur; (3) the mechanical feasibility of a safer design; (4) the cost of an improved design; and (5) the adverse consequences to the product and consumer that would result by installing the alternative design. Barker, 573 P.2d at 431.

first pair didn't work, Jennie made a point to return and purchase a second pair. (ECF No. 193-2 at 226-27). This factor favors a finding that the product at issue had utility to the Plaintiffs and the public as a whole.

b) **Likelihood and Probable Severity of an Injury**

The second relevant factor considers the likelihood that the product might cause an injury and the probable severity of any such injury. <u>Tincher</u>, 104 A.3d at 390. The parties vigorously dispute the dangers posed by button batteries as pertaining to this factor. To this end, Plaintiffs have submitted the expert report of Dr. Kris R. Jatana, M.D., a board-certified otolaryngologist who specializes in the evaluation, diagnosis and treatment of injuries resulting from battery button ingestion in children. (<u>See</u> ECF No. 193-15). Dr. Jatana serves on the Button Battery Task Force, "[a] collaborative effort of representatives from relevant organizations in industry, medicine, public health and government to develop, coordinate and implement strategies to reduce the incidence of button battery ingestion injuries in children." (ECF No. 193-16). Dr. Jatana offered the following opinion with respect to the hazards of battery ingestion:

> It has been established for several decades that button batteries can cause injury rapidly when lodged within the body. The wet tissue surrounding the battery generates current and hydroxide ions, which causes a high pH and alkaline tissue bum. This is medically known as a process called liquafactive necrosis. Liquafactive necrosis essentially dissolves away tissues rapidly. There is also the potential for the contents of the battery to leak out, causing additional injury. Localized tissue pressure from the battery within the esophagus can contribute as another potential source of injury, especially with smaller children. Numerous serious and deadly injuries have been caused by the ingestion of button batteries.

\*     \*     \*     \*     \*     \*     \*

18

> Overall, the smaller batteries (<15 mm diameter) have caused more injuries than larger batteries in the ear canal, tympanic membrane perforation, hearing loss, nasal cavity/nasal septal perforations, periorbital cellulitis, and facial nerve paralysis. It is important to note that small button batteries, <15 mm in diameter have caused SEVERE esophageal injuries when ingested by children under 12 months of age ... These cases resulted in tracheoesohageal fistula, esophageal perforation, esophageal stricture, mediastinitis. Lincoln Punch is the youngest known patient of all these reported cases (<15 mm button battery) to be severely injured. Lincoln Punch suffered several complications after the initial ingestion of the button batteries, and he had several life-saving medical interventions.

(ECF No. 193-15 at 1-2, 4-5). Dr. Jatana cites a host of studies and reports for the proposition that button battery ingestion is common, increasing in frequency, and potentially deadly. (Id. at 5, 8-19).

Defendants counter that the primary risk of injury from button ingestion stems from lithium batteries, rather than alkaline batteries, and that the risk is significantly higher with respect to larger batteries. To the latter point, Defendants cite a report from physician Toby Litovitz and registered nurse Barbara Schmitz noting that, out of the 2,382 cases of battery ingestion reported to a national hotline between July of 1983 and June of 1990, more than 90% of the patients were asymptomatic: "Button cells of less than 15 to 18 mm in diameter generally pass through the gut uneventfully, and removal was rarely indicated for batteries beyond the esophagus." (ECF No. 172-16 at 747). The report further observed that most of the batteries that lodged in an esophagus were of larger diameter (20 to 23 mm). (Id.).

Defendants also contend that the risk of serious injury is much lower for alkaline batteries, such as those in the subject tweezers. Dr. Litovitz's study noted that "lithium cells, with

19

their larger diameters and greater voltage, were associated disproportionately with adverse effects." (Id.). Of the "33 major outcome or fatal cases" involving button battery ingestion in a 2010 study, "31 (93.9%) involved button batteries that were greater than 20 mm." (ECF No. 172-18 at 1171-72). Of the 2,310 ingestions in the study involving battery cells in the 9 to 14 mm diameter range, there were no deaths and only two cases with major outcomes. (Id. at 1171 (Table 1)). Finally, Defendants note that this is the only known personal injury case to have emerged from their distribution and sale of over 1.4 million pairs of the lighted tweezers. (ECF No. 179, ¶ 32).

In light of the sharply conflicting opinions offered by the parties' respective experts, we conclude that there is a genuine material dispute as to the potential danger that an 11 mm alkaline battery poses to a child of Lincoln's age. As such, this factor stands in equipoise.

### c) Availability of Safer Substitute Products

This factor considers whether other, safer alternative designs for the product might be available. The parties do not dispute that the battery case on the subject tweezers was not secured by any mechanical means and could be removed simply by grasping the case and sliding it off of the main housing. (See ECF No. 196-5 at 3). Dr. Glen Stevick, a mechanical engineer engaged as an expert by the Plaintiffs, reported that this design was "defective and unreasonably dangerous" because of how easily the batteries could be accessed. (Id. at 4). Dr. Stevick noted that competing products, including other lighted tweezers currently on the market, secured the batteries with a cap or screw that required a screwdriver or coin to remove. (Id. at 6). He opined that at least five alternative designs existed that, in his opinion, would have more safely secured the batteries.

20

These included: (1) gluing the cap of the battery compartment securely to the base; (2) incorporating a barb into the cap to permanently secure the compartment; (3) incorporating a twist top that must be properly aligned to open; (4) securing the cap with a "snap" enclosure that must be pressed in order to remove the batteries; and (5) incorporating a screw, as with the competitor's exemplar cited in the report. (Id. at 8-9). Dr. Stevick testified that any of these alternative designs would have made the product "much, much safer." (ECF No. 193-25 at 28).

Defendants criticize Dr. Stevick's alternative designs as mere concepts, noting that he did not perform any testing on his any of those designs to demonstrate how they would have made the product safer. (ECF No. 193-25 at 28, 150). Dr. Stevick also admitted that his alternative designs were not completely child-proof and that any of them could conceivably be defeated by a persistent three or five-year-old. (Id. at 232-33). However, these objections go to the cost and utility of making the product safer, rather than the existence of alternative potential designs. Based on Dr. Stevick's report and supporting testimony, the Court finds that this factor cuts in favor of the Plaintiffs.

### d)       Cost and Loss of Utility

The fourth factor considers whether the ability to make the product safer would result in unreasonable increased costs and/or the loss of the product's utility. As noted above, Defendants dispute the viability of Dr. Stevick's alternative designs, noting that they have not been tested or evaluated to determine whether they would truly increase safety or result in unreasonable manufacturing costs. However, Dr. Stevick opined that, in his experience, the cost of securing the battery compartment with a screw would be no more than "a penny or two." (ECF No. 193-25

at 249). He also noted that other products on the market had already integrated that particular design feature, suggesting that it could be done without loss of utility. (ECF No. 196-5 at 6).

Defendants respond that it would be a significant inconvenience to consumers to have to find a coin or tool each time they wanted to open the battery compartment. (ECF No. 172 at 20). Defendants' engineering expert, Dr. Roger McCarthy, opined that requiring "all the battery compartments housing AG13 cells to be accessible only with a tool would impose substantial inconvenience on probably tens of millions of product user[s] with only a negligible impact, if any, on cell pediatric ingestion risk as the only possible result." (ECF No. 172-16 at 1). However, Dr. McCarthy conceded that a feature such as a screw could be added for only a few cents. (ECF No. 193-25 at 93). Moreover, while Dr. McCarthy testified that the "inconvenience tax" of putting a screw on the tweezers would "drive the product off the marketplace," (ECF No. 193-25 at 93-94), Dr. Stevick pointed to examples of tweezers on the market that had already incorporated this type of feature. (ECF No. 196-5 at 6). In light of the stark conflict between the opinions offered by the parties' respective experts, this factor is most appropriately evaluated by a jury. See, e.g., Edwards Sys. Tech. Inc. v. Digital Control Sys., Inc., 99 Fed. Appx. 911, 921 (Fed. Cir. 2004) ("[A] classic 'battle of the experts' ... renders summary judgment improper."); Ins. Co. of Greater N.Y. v. Fire Fighter Sales & Service Co., 120 F.Supp.3d 449, 461 (W.D. Pa. 2015) (denying summary judgment because competing expert opinions created genuine issues of material fact).

> e)    **Ability to Avoid Injury Through Reasonable Care**

The fifth factor considers whether the danger presented by the product at issue could be

avoided through the exercise of care. There is no question that both Jennie and Tony Punch were aware that the tweezers contained a small battery and had sharp metal points. (ECF No. 172-7 at 202-204; ECF No. 172-8 at 143-144). They admitted that the product was not intended for children to use or to play with, and they testified that they kept the tweezers out of reach in a closet for this reason. (Id.). In light of this testimony, a jury could conclude that the Plaintiffs might have avoided the injury had they exercised reasonable care with the product.

### f)       Public Awareness of the Dangers Inherent in the Product

This factor addresses whether a user can reasonably anticipate any dangers inherent in a product based on: 1) the public's general awareness of those dangers; 2) the obviousness of the potential danger based on the condition of the product; and/or 3) the existence of suitable warnings or instructions. Tincher, 104 A.3d at 398. As noted above, there is evidence in the record suggesting that public awareness has increased in recent years with respect to the dangers of button batteries. (ECF No. 193-15 at 1-2). However, Tony and Jennie each testified that they were not aware that the product contained button batteries. Although they realized that the light attached to the tweezers had a power source, Tony testified that he believed that the light was powered by AA or AAA sized batteries based on the size of the battery compartment. (ECF No. 172-8 at 109-110).

The parties also dispute whether the product was accompanied by warnings and instructions at the time that it was purchased. Jennie, the Lindseys, and Siliano each testified that the tweezers they purchased from the Dollar Tree location in question were loose in a bin, unaccompanied by any packaging or inserts. (ECF No. 172-7 at 204-05; ECF No. 193-2 at 30-31;

ECF No. 167-8; ECF No. 167-9 at 22-24; ECF No. 179, ¶ 11). If credited by a jury, this testimony as to the absence of warnings and instructions would tilt this factor in favor of Plaintiffs.

### g) Summary of Risk-Utility Factors

After careful consideration of the aforementioned factors, the Court finds that numerous material factual disputes preclude summary judgment. There is evidence in the record that the product has utility to consumers and that some of the product's inherent dangers could be avoided through the exercise of reasonable care. On the other hand, reasonable minds – and experts – can clearly disagree as to whether additional designs exist that could increase the safety of the product without unreasonably increasing the cost of the product or decreasing its utility. In such circumstances, courts have routinely held that summary judgment is inappropriate. See, e.g., DeJesus, 2016 WL 4702113, at *10 ("[R]easonable minds can disagree over whether the added safety [features proposed by plaintiffs] warrant shifting the extra cost of installation onto [defendant]. Whether the cost of these safety features is reasonable in light of the reduced risk is accordingly an issue best left to the jury."); Morello v. Kenco Toyota Lift, 142 F.Supp.3d 378, 384 (E.D. Pa. 2015) (denying summary judgment as to strict liability design defect claim because "whether the lack of safety features rendered the forklift defective in design is a question of fact for the jury"); Capece v. Hess Machineenfabrik GmbH & Co., 2015 WL 1291798, at *7 (M.D. Pa. Mar. 20, 2015) ("Rational jurors could disagree about . . . whether an alternative design would have been more effective, or could even have prevented [plaintiff's] injury . . . or whether the probability and seriousness of harm caused by the machine outweigh the costs of taking such

precautionary measures."). We reach the same conclusion here.

### h)    Proximate Cause

Having determined, via application of the risk-utility test, that there are disputed issues of material fact with respect to the defectiveness of the tweezers, the Court must next consider whether those alleged defects were the proximate cause of Lincoln's injuries. To establish proximate cause, the product defect must have been a "substantial factor in bringing about the accident, even though it need not be the only factor." DeJesus, 2016 WL 4702113, at *10 (quoting Pennsylvania Dep't of Transp. v. Phillips, 488 A.2d 77, 86 (Pa. 1984)).

Defendants primarily focus their causation argument on the circumstances that permitted Jenna or Remington to access the tweezers, remove the batteries, and feed those batteries to Lincoln, all without a parent intervening. As a general matter, the plaintiff's own negligent conduct "is not relevant if the product defect contributed in any way to the harm." Id. (quoting Jara v. Rexworks, Inc., 718 A.2d 788, 793-94 (Pa. Super. 1998); Kimco Dev. Corp. v. Michael D's Carpet Outlets, 637 A.2d 603, 607 (Pa. 1993) (holding that the doctrine of comparative negligence does not apply to a strict products liability action). At the same time, Pennsylvania courts permit a defendant "to introduce evidence that the plaintiff assumed the risk," "misused the product," or "engaged in highly reckless conduct to defeat a products liability claim." Dillinger v. Caterpillar, Inc., 959 F.2d 430, 445 (3d Cir. 1992). Under these limited theories, courts have reasoned that a plaintiff's conduct is so "unforeseeable and outrageous" that it breaks the chain of causation and amounts to a superseding cause of the injuries. Rapchak v. Haldex Brake Products Corp., 2016 WL 3752908, at *5 (W.D. Pa. July 14, 2016) (citing Reott v. Asia

Trend, Inc., 55 A.3d 1088 (Pa. 2012)). At least one court in this district has held that this general

paradigm has not changed in the wake of the Pennsylvania Supreme Court's decision in Tincher.

 Id. at *6 ("Notwithstanding all of the changes wrought by Tincher, the risk of harm still rests

with the manufacturer or seller of the product and the focus remains on the product").

Defendants' summary judgment motions invoke this concept of superseding cause,

arguing that the manner in which the button batteries were caused to be ingested by Lincoln were

so convoluted and extraordinary as to break any chain of causation:

> [Plaintiffs contend] that three-year old Jenna Punch must have gone into
> the house, unattended, and for the fifteen minutes that her mother was in
> the bathroom, searched for and found a step stool in the kitchen, took the
> step stool to the closet door in the kitchen, opened up the closet door,
> climbed up onto the step stool to locate the tweezers, located the
> tweezers, climbed down from the step stool, walked into the living room,
> and in some unknown way and for some unknown reason, removed the
> batteries from the tweezers and then fed not one, but two, of the batteries
> to Lincoln Punch, who was alone on a mattress and box spring on the
> floor.

(ECF No. 172 at 16).

We disagree. Had the battery case been inaccessible to Jenna, even for a short period of

time,[6] there is evidence to suggest that the injury might have been avoided. Thus, even if a jury

were to conclude that this chain of events was as far-fetched as Defendants imply, or that

parental neglect contributed to Jenna's ability to retrieve the tweezers, it could still conclude that

---

6

Dr. Stevick admitted that a motivated child could eventually overcome each of his proposed safety features with determination and the proper tools. However, it is undisputed that Lincoln was only left alone by his mother for a few minutes while she was using the bathroom and that Jenna was only unattended for approximately fifteen minutes before her father went to look for her. Under these facts, a jury could conclude that even a fallible safety feature might have been sufficient to delay Jenna long enough to allow her parents to intervene and avoid the injury.

a more secure product would have prevented the particular harm suffered by Lincoln. <u>See</u>, <u>e.g.</u>, <u>DeJesus</u>, 2016 WL 4702113, at *11 ("To defeat causation, [defendant] would have to demonstrate that the accident *was solely attributable* to a superveding cause.") (emphasis added); <u>Clark v. Bil-Jax, Inc</u>., 763 A.2d 920, 924 (Pa. Super. 2000) ("A user's negligent conduct is not relevant if the product defect contributed in any way to the harm. [Only] where the defense offers evidence to show that the accident at issue was *solely* the result of plaintiff's conduct, and not a defective product, it is relevant and admissible for proving causation.") (quoting <u>Jara v. Rexworks</u>, 718 A.2d 788, 793-94 (Pa. Super. 1998) (emphasis in original). The question is "accordingly best left to the jury." <u>DeJesus</u>, 2016 WL 4702113, at *11 (denying summary judgment where the record contained conflicting evidence as to whether a superseding cause vitiated causation with respect to an allegedly defective product); <u>Richetta v. Stanley Fastening Sys., L.P.</u>, 661 F.Supp.2d 500, 511 (E.D. Pa. 2009) (where the record contained evidence that a product defect (the absence of a safety lock on a nail gun) and an intervening cause (plaintiff's failure to unplug the gun) both might have contributed to plaintiff's injury, summary judgment as to proximate cause was unwarranted; "it cannot be conclusively said at this juncture that the accident was solely a result of Richetta's conduct and not related in any way to the alleged defect in the nail gun.").

### 3. Design Defect – Negligence

To prevail in an action alleging negligent design, the plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage. <u>Phillips v.</u>

Cricket Lighters, 841 A.2d 1000, 1008 (Pa. 2003). Unlike a strict products liability claim, which "examines the product itself . . . without inquiring into the reasonableness of the manufacturer's conduct in creating and distributing such a product," a negligence action "revolves around an examination of the conduct of the defendant." Id. This standard is "more stringent and, thus, more difficult to satisfy" than a strict liability claim. Schwartz v. Abex Corp., 106 F.Supp.3d 626, 654 (E.D. Pa. 2015) (citing Tincher, 104 A.3d at 364, 401).

Determining whether a duty exists under a particular set of facts is a question of fairness rooted in "amorphous public policy considerations, which may include our perception of history, morals, justice, and society." Atcovitz v. Gulph Mills Tennis Club, Inc., 812 A.2s 1218, 1222 (Pa. 2002). Although determining the existence of a duty of care is typically a question of law, a jury is required where the existence of a duty depends on the outcome of the underlying facts. DeJesus, 2016 WL 4702113, at *11 (citing Restatement (Second) of Torts § 328B cmt. e) ("Where the existence of the duty will depend upon the existence or non-existence of a fact as to which the jury may reasonably come to either one of two conclusions . . . then it becomes the duty of the court to instruct the jury as to the defendant's duty, or absence of duty, if either conclusion as to such fact is drawn."). Thus, "if a plaintiff has produced sufficient evidence such that there is an issue as to whether the defendant owed him a duty of care, a negligence claim will survive summary judgment." Kagan v. Harley Davidson, Inc., 2008 WL 3874824, at *16 (E.D. Pa. Aug. 20, 2008).

In determining whether a duty of care exists, the court must consider the following five factors: (1) the relationships between the parties; (2) the social utility of the defendant's conduct;

(3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the defendant; and (5) the overall public interest in the proposed solution. <u>Althaus v. Cohen</u>, 756 A.2d 1166, 1169 (Pa. 2000). No single "<u>Althaus</u> factor" is dispositive; rather, "a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant." <u>Phillips</u>, 841 A.2d at 1008-09.

With respect to the first factor, courts have routinely held that the relationship between a purchaser and the seller of a product weighs in favor of finding a duty of care. <u>See</u>, <u>e.g.</u>, <u>Phillips</u>, 841 A.2d at 1009 ("As to the first prong of the <u>Althaus</u> test, there was clearly a relationship between [plaintiff], as the purchaser of the butane lighter, and [defendants]"); <u>Barton v. Lowe's Home Centers, Inc.</u>, 124 A.3d 349, 359 (Pa. Super. 2015) ("[T]here is a relationship between Husqvarna and Kohler, on one hand, and [plaintiff] on the other, because [plaintiff] is the purchaser of the lawnmmower (and engine)" manufactured and sold by defendants).

The second factor addresses the social utility of the defendants' conduct. <u>Althaus</u>, 756 A.2d at 1170. Courts have typically evaluated this factor by comparing the utility of the allegedly deficient product with the utility of the product with the requested safeguards. <u>See</u> <u>Barton</u>, 124 A.3d at 359 ("[T]he utility of lawnmowers is obvious, but a lawnmower outfitted with safeguards against overheating has even greater utility"); <u>Phillips</u>, 841 A.2d at 1010 (social utility of butane lighter was clear, but the utility of a lighter with childproof features would be greater); <u>DeJesus</u>, 2016 WL 4702113, at *12 (utility factor weighs in favor of a duty where safety features could make the product safer without loss of functionality). Because there is evidence in the record to suggest that the safety features proposed by Plaintiffs' expert could be added to the product

without significant loss of function, a jury could conclude that this factor weighs in favor of the existence of a duty.

The third factor examines the nature of the risk imposed by the product and the foreseeability of the harm incurred. Althaus, 756 A.2d at 1170. As previously discussed, the parties dispute whether the type of injury that occurred in this case was foreseeable. Plaintiffs have submitted evidence, most notably in the form of Dr. Jatana's expert report, suggesting that ingestion of button batteries is a well-known and common cause of serious injury to young children. (ECF No. 193-15 at 1-2, 4-5); see Phillips, 841 A.2d at 1009 (evidence that a substantial number of fires are caused each year by children playing with butane lighters weighs in favor of foreseeability). Defendants counter that the alkaline batteries used in the lighted tweezers are significantly less dangerous than other types of button batteries and that, of the millions of tweezers sold, Lincoln's injuries are the only known to have occurred. (ECF No. 172-16 at 747; ECF No. 172-18 at 1171-72; ECF No. 179, ¶ 32); see DeJesus, 2016 WL 4702113, at *12 (suggesting that the lack of prior incidents was a factor to be considered in determining foreseeability). This evidentiary conflict creates a material issue of disputed fact as to the third Althaus factor. Id. ("Whether this danger was unreasonably foreseeable is . . . a question better left to the jury").

The fourth factor requires the court to consider the consequences of imposing a duty on the Defendants. Barton, 124 A.3d at 359. There is evidence in the record to suggest that the cost of altering the lighted tweezers to restrict access to the battery case would be negligible. (ECF No. 193-25 at 249). Where the cost of adding safety features to a product is minimal, this factor

weighs in favor of the existence of a duty. Phillips, 841 A.2d at 1009-10 (stating that this factor weighed in favor of the existence of a duty because plaintiff had adduced evidence that the cost of childproofing the subject lighter "would be nominal"); Barton, 124 A.3d at 359 ("[I]t seems reasonable to conclude that alternative design or manufacturing safeguards against overheating would not be cost-prohibitive").

Finally, the court considers the "overall public interest" in imposing a duty on the defendants. DeJesus, 2016 WL 4702113, at *13. Courts have widely determined that there is a strong public interest in favor of avoiding accidents caused by allegedly defective products. See Phillips, 841 A.2d at 1010 ("We find that there is a strong public interest in minimizing fires started as a result of children playing with butane lighters."); Barton, 124 A.3d at 359 ("The fifth Althaus factor . . . weighs in favor of the existence of a duty . . . because the public has a strong interest in minimizing the risk of harm that lawnmowers present to persons and property."). This reasoning applies with equal force to the dangers posed by button batteries.

Considering the five Althaus factors as a whole, and viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that there are several disputed issues of material fact concerning the existence of a duty of care. Each of the five factors, to varying degrees, could be viewed as supporting the existence of a duty should a jury credit Plaintiffs' version of the underlying facts. Under such circumstances, summary judgment is inappropriate.[7]

---

[7] Our prior conclusion that summary judgment was not warranted on the issue of causation in the context of Plaintiffs' strict liability design defect claim applies with equal measure to Plaintiffs' design claims based on negligence.

4.      **Failure to Warn – Strict Liability**

In Pennsylvania, strict liability claims based on an alleged failure to warn are governed by § 402A of the Restatement (Second) of Torts. <u>Pavlik</u>, 135 F.3d at 881. Pursuant to § 402A, "an otherwise properly designed product may still be unreasonably dangerous (and therefore 'defective') for strict liability purposes if the product is distributed without sufficient warnings to apprise the ultimate user of the latent dangers in the product." <u>Id</u>. (citing <u>Davis v. Berwind Corp</u>., 690 A.2d 186, 190 (Pa. 1997). The elements of a failure to warn case are the same as for a design defect claim: (1) the product must be defective; (2) the defect must have been the proximate cause of the injuries; and (3) the defect existed at the time the product left the seller's hands. <u>Id</u>. (citations omitted).  However, in the failure to warn context, the second prong is satisfied where the plaintiff establishes "that it was the total lack or insufficiency of a warning that was both a cause-in-fact and the proximate cause of the injuries." <u>Id</u>. (citing <u>Greiner v. Volkswagenwerk Aktiengesellschaft</u>, 540 F.2d 85 (3d Cir. 1976)).

The question of causation in a failure to warn case is ordinarily left to the jury. <u>Id</u>. However, "if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and the plaintiff's injury clearly appears, the question becomes one of law." <u>Id</u>. (citing <u>Conti v. Ford Motor Co</u>., 743 F.2d 195, 197 (3d Cir. 1984)). Thus, to reach a jury on a failure to warn theory of liability, "the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning might have prevented the injury."  <u>Id</u>. (citing <u>Conti</u>, 743 F.2d at 197).

In attempting to meet their burden, the plaintiffs are entitled to a rebuttable presumption

that they would have heeded any warnings that had accompanied the allegedly defective product. Restatement (Second) of Torts § 402A; <u>Pavlik</u>, 135 F.3d at 881. This presumption can be overcome by evidence showing "that a reasonable fact finder would be bound to find that [plaintiffs] were fully aware of the risk of bodily injury" presented by the product. <u>Post v. Ingersoll-Rand Co.</u>, 2002 WL 34684774, at *3 (W.D. Pa. Feb. 20, 2001) (quoting <u>Pavlik</u>, 135 F.3d at 884).

In the instant case, the Punches contend that, had they been adequately warned about the fact that the lighted tweezers contained button batteries, they would have stored the item out of Jenna and Remington's reach or declined to purchase it in the first place. Because neither of these contentions is supported by the record, and because it is evident that the Punches were already aware of the dangers posed by the tweezers, summary judgment is appropriate.

As an initial matter, the record conclusively reflects that the Punches already viewed the tweezers as a dangerous item that should not be permitted around children. At her deposition, Jennie admitted that she was aware that the tweezers contained hazards that made them unsuitable for her kids to use:

> Q:    Now, when you purchased those tweezers, you knew it wasn't a toy, correct?
>
> A:    Correct.
>
> Q:    And you didn't buy it for the children to play with as a toy, correct?
>
> A:    Correct.
>
>             *      *      *      *      *      *      *
>
> Q:    And you knew that the tweezers that you purchased were sharp, correct?

A: Yes.

*    *    *    *    *    *    *

Q: Based on your life experience, did you know that tweezers should not be played with and handled by a small child?

A: Yes.

*    *    *    *    *    *    *

Q: Because this particular product had a light and it had sharp tweezers and it had small batteries, did you know to keep it away from your children?

A: Yes. It was generally in [a] cabinet.

(ECF No. 172-7 at 202-204). Tony agreed that the tweezers posed an open and obvious danger to children and were for adult use only:

Q: When – when your wife brought home the tweezers, I take it that it was for her exclusive use and your exclusive use, rather than a device that would be used by children. Correct?

A: Correct. It was just for our use.

Q: And was it obvious to you that this product should not be in the hands of your son or your daughter?

A: Yes.

(ECF No. 172-8 at 143). Tony and Jennie also acknowledged that they were aware that the lighted tweezers contained a small battery (or batteries) and that such batteries could pose a choking hazard. (ECF No. 175-2 at 61; ECF No. 172-8 at 58). In short, the record compels the conclusion that the Punches were well aware that the tweezers were dangerous, even in the absence of a specific warning to keep them away from children. Under such circumstances,

34

summary judgment is appropriate. <u>See</u>, <u>e.g.</u>, <u>Conti</u>, 743 F.2d at 198 (reversing the district court's decision to submit the issue of causation to a jury after determining that there was ample evidence in the record to suggest that the plaintiff was already aware of the danger posed by the product at issue).

The Punches' contention that they would have changed their course of conduct had they been specifically warned of the presence of button batteries in the tweezers is also unsupported on this record. Tony testified that, had he been properly warned about the specific fact that the tweezers contained button batteries, he would have stored the item out of the children's reach:

> Q:    [I]f the warnings [on the product] said keep out of the reach of children, would you have kept the tweezers out of the reach of your children?
>
> A:    Yes.
>
> Q:    How would you have done that?
>
> A:    I would have put it way up.
>
> Q:    Way up high.
>
> A:    Way, way up high, yes.

(ECF No. 178-2 at 103). This is the precise precaution that the Punches took when they decided to store the product in an upper shelf in a hall closet, above their dishwasher. (ECF No. 175-2 at 35-36).

They also suggest that they would not have purchased the item at all had they known that it contained small batteries. Jennie testified that she generally "did not buy button batteries at all," (ECF No. 172-7 at 61), and Tony testified that he would "never have let them in [his]

house." This testimony is contradicted by the fact that the Punch children already owned numerous items containing button batteries including clothing, shoes, light-up towels, and toys. (ECF No. 178-2 at 96-99). Indeed, the Punches still have car key fobs in their house that use button batteries. (ECF No. 178-2). Where there is no evidence in the record that a plaintiff would have changed their course of conduct had they received the requested warning, that lack of warning cannot be the proximate cause of their injury. See, e.g., Powell v. J.T. Posey Company, 766 F.2d 131 (3d Cir. 1985) (finding that, despite plaintiff's lack of awareness as to the specific danger that resulted in her injury, there was no evidence in the record that she would have changed her course of conduct had she been provided with the warning she sought).

In sum, there is no evidence to support the Plaintiffs' contention that they would have taken any precautions beyond those that they had already taken based on their acute understanding that the tweezers were potentially dangerous. Because Plaintiffs have failed to adduce sufficient evidence "to support a reasonable inference, rather than a guess, that the existence of an adequate warning may have prevented the accident," Conti, 743 F.2d at 198, it is recommended that summary judgment be granted as to Plaintiffs' failure to warn claim.

5.      **Failure to Warn – Negligence**

As discussed above, a plaintiff cannot prevail in a negligence action without demonstrating that the defendant's breach of a duty of care was the proximate cause of any ensuing damages. Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 61 (3d Cir. 2009); Moroney v. General Motors Corp., 850 A.2d 629, 633-34 (Pa. Super. 2004). Having already determined that the lack of a warning on the tweezers was not the proximate cause of Lincoln's injuries,

Plaintiffs' negligent failure to warn claim must also fail.

**6.      Statute of Limitations**

As a final matter, Dollar Connection seeks dismissal of "any and all claims asserted by Plaintiffs Tony Punch and Jennie Punch, in their own right" based on the applicable statute of limitations. (ECF No. 169 at 2). Plaintiffs did not file any response to this motion.

A personal injury to a minor in Pennsylvania gives rise to two causes of action: "one the parent's claim for medical expenses and loss of the minor's services during minority, the other the minor's claim for pain and suffering and for losses after minority." Hathi v. Krewstown Park Apartments, 561 A.2d 1261, 1262 (Pa. Super. 1989) (quoting Olivieri v. Adams, 280 F.Supp. 428, 429 (E.D. Pa. 1968)). The statute of limitations for actions based on negligence and products liability in Pennsylvania is two years. 42 Pa.C.S.A. § 5524(2). Where the victim is a minor, the two-year statute of limitation for their own personal injury claims does not begin to run until the victim reaches eighteen years of age.  See 42 Pa.C.S.A. § 5533(b).  However, a parent's claim in their own right arising out of the same injury begins to run immediately. As explained by the Pennsylvania Supreme Court:

> [T]he period within which a minor's action must be commenced is measured not from the time the cause of action accrues, but from the time he or she turns eighteen. This is true regardless of the fact that a guardian may sue on behalf of a minor at any time after a cause of action accrues. If a guardian does sue on behalf of a minor, the action has been commenced before the limitation period has started to run. Nevertheless, the limitation period remains suspended. As in any other situation, the commencement of an action has no bearing on the limitation period.
>
> In this case, [the minor child's] cause of action accrued when she was born on July 16, 1992. Pursuant to 42 Pa.C.S. § 5533(b), the two-year

> limitation period for her personal injury claim does not begin to run until July 16, 2010. *Her parents' claims arising out of the same facts likewise accrued when Susan was born, but the two-year limitation period for their claims began to run at that time.*

Fancsali *ex rel*. Fancsali v. University Health Center of Pgh., 761 A.2d 1159, 1164 (Pa. 2000) (emphasis added).

In Hathi, the court relied on the same principle to grant summary judgment against the parents of an injured minor with respect to their own claims for medical expenses and loss of the minor's services. Hathi, 561 A.2d at 1261. Their minor son suffered an injury on September 6, 1984. Id. On October 29, 1986, his parents commenced a suit to recover damages both in their own right and on behalf of their minor son. Id. Applying Section 5533(b), the court held that their claims brought on behalf of their son were tolled for the duration of the child's infancy. Id. The claims brought by the parents on their own behalf, however, were untimely:

> [Parents'] tort claim is barred by the two year statute of limitations. 42 Pa.C.S.[A]. § 5533 provides: "except as otherwise provided by [statute], infancy, insanity or imprisonment does not extend the time limited by this subchapter for the commencement of a matter." [Parents] have not averred that they were affected by the conditions of infancy, insanity or imprisonment. As amended, section 5533(b) prevents the years of minority from being included in the statute of limitations' running time. [Parents] were over the age of 18 at all times relevant; they received no benefit from the amendment of § 5533.

Id. at 1262-63 (quoting Apicella v. Valley Forge Military Academy and Junior College, 630 F.Supp. 20, 23-24 (E.D. Pa. 1985)) (emphasis removed).

In the instant case, Lincoln suffered his injuries on April 12, 2011. His parents commenced their action against Dollar Tree on July 6, 2012. Those claims are timely as to both

Lincoln and his parents. However, the Plaintiffs did not assert their claims against Dollar Connection until February 3, 2015, well over two years after the injury occurred. Based on <u>Hathi</u> and <u>Fancsali</u>, Tony and Jennie's claims against Dollar Connection in their own right are untimely and must be dismissed. <u>Fancsali</u>, 761 A.2d at 1164; <u>Hathi</u>, 561 A.2d at 1262-63.

## III.   CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendant Dollar Connection's Motion for Summary Judgment Based Upon Statute of Limitations [ECF No. 166] be granted; Motion for Summary Judgment Based Upon Spoliation of the Product at Issue [ECF No. 167] be denied; Motion for Summary Judgment as to Plaintiffs' Design Defect Claims [ECF No. 171] be denied; and Motion for Summary Judgment as to Plaintiffs' Failure to Warn Claims [ECF No. 174] be granted.

It is further recommended that Defendants Dollar Tree and Greenbrier's Motion for Summary Judgment [ECF No. 177] be granted in part and denied in part. Defendants' motion should be granted as to Plaintiffs' failure to warn claims sounding in strict liability and negligence; and should be denied as to Plaintiffs' negligent and strict liability design defect claims, and as to spoliation.

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed.R.Civ.P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file objections will waive the right to appeal. <u>Brightwell v. Lehman</u>, 637 F. 3d 187, 193 n. 7 (3d Cir.

2011).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: February 17, 2017

cc:    The Honorable Cathy Bissoon
       United States District Judge